**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

WHOLE WOMAN'S HEALTH ALLIANCE;
FUND TEXAS CHOICE; LILITH FUND, INC.;
NORTH TEXAS EQUAL ACCESS FUND; THE
AFIYA CENTER; WEST FUND; and BHAVIK
KUMAR, M.D., M.P.H.,

                    Plaintiffs,

v.

KEN PAXTON, Attorney General of Texas, in his
official capacity; CECILE YOUNG, Acting
Executive Commissioner of the Texas Health &
Human Services Commission, in her official
capacity; JOHN W. HELLERSTEDT, M.D.,
Commissioner of the Texas Department of State
Health Services, in his official capacity; SCOTT
FRESHOUR, Interim Executive Director of the
Texas Medical Board, in his official capacity;
LARRY R. FAULKNER, PH.D., Interim
Chancellor of the University of Texas System, in
his official capacity; and DAVID ESCAMILLA,
Travis County Attorney, in his official capacity
and as representative of the class of all Texas
county and district attorneys with authority to
prosecute misdemeanor offenses,

                    Defendants.

CIVIL ACTION

CASE NO. 1:18-CV-00500

## COMPLAINT

Plaintiffs, by and through their undersigned attorneys, bring this complaint against the above-named Defendants and their employees, agents, and successors in office, and in support thereof allege the following:

## PRELIMINARY STATEMENT

1.      Plaintiffs are nonprofit organizations and healthcare professionals who provide abortion care or facilitate access to abortion care.  They bring this action pursuant to 42 U.S.C. § 1983 to challenge Texas laws that unduly burden abortion access.

2.      In an unbroken line of precedent spanning more than four decades, the Supreme Court has held that the right to end a pregnancy is a fundamental component of the liberty protected by the Due Process Clause.  *See, e.g.*, *Whole Woman's Health v. Hellerstedt*, ___ U.S. ___, 136 S. Ct. 2292, 2309-10 (2016); *Lawrence v. Texas*, 539 U.S. 558, 565, 573-74 (2003); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851-53 (1992); *Roe v. Wade*, 410 U.S. 113, 152-54 (1973).  This right is critical to women's dignity, equality, and bodily integrity.[1]  *See, e.g.*, *Casey*, 505 U.S. at 851-52, 856-57.

3.      The Supreme Court has held that states may subject abortion to reasonable regulation, provided that it does not impose an undue burden on abortion access.  In a recent decision, the Supreme Court clarified that a law fails this standard if it imposes burdens on abortion access that are not justified by proportional benefits.  *See Whole Woman's Health*, 136 S. Ct. at 2300.

4.      Texas has failed to respect these constitutional parameters.

---

[1] Most people with the capacity to become pregnant identify as women.  Historically, both jurisprudence and public health data have focused on women when addressing reproductive rights and health.  But there is an emerging recognition in the law and society more generally that not all people who may become pregnant identify as women.  *See generally Glenn v. Brumby*, 663 F.3d 1312, 1316-19 (11th Cir. 2011) (holding, consistent with the weight of authority, that the Equal Protection Clause prohibits discrimination on the basis of "gender nonconformity") (collecting cases); Robin Marantz Henig, *How Science Is Helping Us Understand Gender*, National Geographic (2017), https://www.nationalgeographic.com/magazine/2017/01/how-science-helps-us-understand-gender-identity/.  The Constitution protects the right of all individuals to end an unwanted pregnancy, regardless of gender identity.

5. Texas laws regulating abortion have proliferated over time. Pursuing an incremental strategy designed to chip away at abortion access, the State has layered restrictions on top of restrictions, steadily increasing the burdens faced by people seeking to end their pregnancies. Reasonable regulations have been superseded by unreasonable ones, increasing the cost and decreasing the availability of abortion care, while failing to provide added benefits. Abortion patients and providers now face a dizzying array of medically unnecessary requirements that are difficult, time-consuming, and costly to navigate—sometimes prohibitively so.

6. Plaintiffs ask the Court to strike down Texas' unduly burdensome abortion laws, returning the State to a regime of reasonable and medically appropriate abortion regulation.

## JURISDICTION AND VENUE

7. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331 because this case is a civil action "arising under the Constitution, laws, or treaties of the United States," and by 28 U.S.C. § 1343(a)(3) because this case seeks to redress the deprivation of federal constitutional rights under color of State law.

8. Venue is appropriate under 28 U.S.C. § 1391(b)(1)-(2) because the Defendants reside in this district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## PLAINTIFFS

9. Whole Woman's Health Alliance ("WWHA") is a Texas non-profit corporation committed to providing holistic reproductive healthcare. It operates a licensed abortion clinic in Austin, Texas, where it has provided high-quality abortion care since April 2017. It brings this lawsuit on behalf of itself and its patients.

10.    Fund Texas Choice is a Texas nonprofit corporation that assists Texas residents in accessing abortion care.  It provides direct financial assistance to individuals who must travel to access abortion care to cover the cost of transportation and accommodations.  It works closely with clients to assess their needs and develop individualized access plans.  Some of Fund Texas Choice's clients must travel out of state to obtain abortion care because the burdens created by Texas law make it too difficult to obtain that care in Texas.  Fund Texas Choice covers one hundred percent of its clients' needs with respect to travel costs.  But financial constraints prevent it from assisting every potential client in need.  It had to cease funding clients in December 2017 because of insufficient revenue and could not resume funding clients until March 2018.  Fund Texas Choice brings this lawsuit on behalf of itself and its clients.

11.    Lilith Fund, Inc. ("Lilith Fund"), is a Texas non-profit corporation that assists Texans in exercising their fundamental right to abortion by removing barriers to access.  It provides direct financial assistance to individuals residing in central and south Texas who want to end a pregnancy but cannot afford the full cost of an abortion procedure.  Lilith Fund works closely with its clients to facilitate their access to abortion care.  It recently hired a social worker to provide case management and doula services to its clients, as well as to facilitate a post-abortion support group.  Lilith Fund has served over 10,000 clients since its founding in 2001.  Unfortunately, financial constraints prevent it from serving every potential client who requests its assistance and from paying the full cost of an abortion procedure for each client that it does serve.  Last year, Lilith Fund served nearly 1,500 clients.  The average procedure cost for those clients was $1,162.74, and Lilith Fund's average grant amount was $193.82.  In some cases, Lilith Fund's clients had to travel outside of Texas to obtain abortion care.  Lilith Fund brings this lawsuit on behalf of itself and its clients.

12. North Texas Equal Access Fund ("TEA Fund") is a Texas nonprofit corporation serving people in northern Texas. It provides direct financial assistance to individuals who want to end a pregnancy but cannot afford an abortion procedure. TEA Fund works closely with its clients to facilitate their access to abortion care. It recently hired a social worker to support its clients through this process. Unfortunately, financial constraints prevent it from serving every potential client who requests its assistance and from paying the full cost of an abortion procedure for each client that it does serve. Last year, TEA Fund was able to offer financial assistance to approximately two-thirds of the individuals who requested assistance. It served 668 clients in all, providing an average grant of $256. In some cases, TEA Fund's clients had to travel outside of Texas to obtain abortion care. TEA Fund brings this lawsuit on behalf of itself and its clients.

13. The Afiya Center is a Texas nonprofit corporation with a mission to serve Black women and girls in Texas by transforming their relationship with their sexual and reproductive health through addressing the consequences of reproductive oppression. Using a reproductive justice framework, The Afiya Center works to assist Black women who are at high risk of contracting HIV/AIDS; reduce the maternal mortality rate among Black women; and facilitate Black women's access to abortion care. In connection with the latter work, The Afiya Center works one-on-one with clients in North Texas seeking abortion care. Its staff members conduct individualized assessments of clients' needs, provide clinic referrals and case management services, and follow up with clients periodically after their abortions. The Afiya Center also provides direct financial assistance to those who cannot afford the cost of obtaining abortion care. The Afiya Center brings this lawsuit on behalf of itself and its clients.

14. West Fund is a Texas nonprofit corporation that is committed to breaking down barriers to abortion care and helping people who want an abortion but do not have enough money

to pay for it. It provides direct financial assistance to individuals in West Texas who want to end a pregnancy but cannot afford the cost of an abortion procedure. Its trained volunteer case managers provide health center information and financial assistance to callers through its helpline. Unfortunately, financial constraints prevent the West Fund from paying the full cost of an abortion procedure for its clients. The average procedure cost its clients face is $2,200. West Fund typically provides grants of $150 to $350. In some cases, West Fund's clients must travel outside of Texas to obtain abortion care. West Fund brings this lawsuit on behalf of itself and its clients.

15.     Bhavik Kumar, M.D., M.P.H., is a board-certified family medicine physician licensed to practice medicine by the State of Texas. Dr. Kumar serves as the Medical Director of WWHA's Austin clinic. He provides abortion care there and at other licensed abortion facilities in Texas. Dr. Kumar brings this lawsuit on behalf of himself and his patients.

**DEFENDANTS**

16.     Ken Paxton, Attorney General of Texas, is sued in his official capacity. He has statutory authority to enforce certain of the laws challenged in this action. The Office of the Attorney General maintains its headquarters in Travis County.

17.     Cecile Young, Acting Executive Commissioner of the Texas Health & Human Services Commission ("Health Commission"), is sued in her official capacity. She has statutory authority to enforce certain of the laws challenged in this action. The Health Commission maintains its headquarters in Travis County.

18.     John W. Hellerstedt, M.D., Commissioner of the Texas Department of State Health Services ("Health Department"), is sued in his official capacity. He has statutory authority to enforce certain of the laws challenged in this action. The Health Department maintains its headquarters in Travis County.

19.     Scott Freshour, Interim Executive Director of the Texas Medical Board ("Medical Board"), is sued in his official capacity.  He has statutory authority to enforce certain of the laws challenged in this action.  The Medical Board maintains its offices in Travis County.

20.     Larry R. Faulkner, Ph.D., Interim Chancellor of the University of Texas System ("University"), is sued in his official capacity.  The University has applied the limitations on abortion funding set forth in the General Appropriations Act of the 85th Legislative Session in an unconstitutional manner.  The University maintains its headquarters in Travis County.

21.     David Escamilla, Travis County Attorney, is sued in his official capacity and as representative of the class of all Texas county and district attorneys with authority to prosecute misdemeanor offenses.

## FACTUAL ALLEGATIONS

## I.      BACKGROUND

### A.  *Overview of Abortion Care in the United States*

22.     In the United States, the abortion rate has declined sharply since 2008.  The reasons for this decline are not fully understood, but have been attributed to improved access to contraceptives, particularly long-acting reversible contraceptives ("LARCs") such as intrauterine devices and implants; as well as an increase in state laws that limit access to abortion care.

23.     Nevertheless, abortion remains a common procedure.  In 2014, the most recent year for which data are currently available, approximately 926,200 abortions were induced in the United States.  Of those, 55,230 took place in Texas.[2]

---

[2] *See* Guttmacher Institute, *State Facts About Abortion: Texas* 1 (2018), https://www.guttmacher.org/sites/default/files/factsheet/sfaa-tx.pdf.

24.     At current rates, approximately one in every four women in the United States will have an abortion by age 45.[3]

25.     Most abortion patients are in their 20s (60%) and 30s (25%).[4]

26.     Nearly 60% of abortion patients have previously given birth to a child.[5]

27.     No racial or ethnic group comprises the majority of abortion patients. Nationwide, 39% of abortion patients are white; 28% are black; 25% are Hispanic; 6% are Asian or Pacific Islander; and 3% identify with other racial or ethnic classifications.[6]

28.     Most abortion patients (62%) are religiously affiliated. The majority (54%) are Christians.[7]

29.     Three-quarters of abortion patients in the United States are low-income, with nearly half living below the federal poverty level.[8]

30.     Three methods of abortion are commonly used in the United States: medication abortion, aspiration abortion, and D&E abortion.

31.     Medication abortion entails the administration of medications that end a pregnancy and cause the uterus to expel its contents. This method may be used from the start of pregnancy up to 10 weeks' gestation as measured by a woman's last menstrual period ("lmp").

---

[3] Rachel K. Jones & Jenna Jerman, Population Group Abortion Rates and Lifetime Incidence of Abortions: United States, 2008-2014, 107 Am. J. Pub. https://ajph.aphapublications.org/doi/10.2105/AJPH.2017.304042.

[4] Jenna Jerman, Rachel K. Jones & Tsuyoshi Onda, Guttmacher Institute, *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008* 5 (2016), https://www.guttmacher.org/report/characteristics-us-abortion-patients-2014.

[5] *Id.* at 7.

[6] *Id.* at 5.

[7] *Id.* at 7.

[8] *Id.* at 7.

32.     Aspiration abortion entails the use of suction to empty the contents of the uterus. This method is typically used from 6 weeks lmp to 14-16 weeks lmp.

33.     D&E abortion entails the use of suction and medical instruments to empty the contents of the uterus.  This method is typically used beginning at 14-16 weeks lmp.

34.     A fourth method of abortion—called induction—is used rarely in the United States. It entails the administration of medications to induce labor and delivery of a fetus, typically after 16 weeks lmp.

35.     A Committee of the National Academies of Sciences, Engineering, and Medicine recently issued a Consensus Study Report on the Safety and Quality of Abortion Care in the United States after reviewing all available evidence.[9]  It concluded that abortion in the United States is safe; serious complications of abortion are rare; and abortion does not increase the risk of long-term physical or mental health disorders.

36.     The Committee assessed the quality of abortion care based on six factors:  safety, effectiveness, patient-centeredness, timeliness, efficiency, and equity.  It concluded that the quality of abortion care depends to a great extent on geography.  In particular, it found that "[i]n many parts of the country, state regulations have created barriers to optimizing each dimension of quality care."[10]

37.     In a recent decision striking down a pair of Texas abortion restrictions, the U.S. Supreme Court likewise concluded that abortion is safe and complications from abortion are rare. *See Whole Woman's Health*, 136 S. Ct. at 2311, 2315.  Indeed, the Supreme Court found that abortion is safer than many other procedures commonly performed in outpatient settings.  *See id.*

---

[9] National Academies of Sciences, Engineering, and Medicine, *The Safety and Quality of Abortion Care in the United States* 1-16 (2018), https://doi.org/10.17226/24950.

[10] *Id.* at 10.

at 2315.  It also recognized that unnecessary regulatory requirements may diminish the quality of care that patients receive.  *See id.* at 2318.

38.     Although abortion is safe throughout pregnancy, the risk, complexity, duration, and cost of abortion increase with gestational age.

39.     The vast majority of abortions occur during the first trimester of pregnancy.

40.     In 2014, 90% of abortions nationwide occurred during the first trimester.[11]  For Texas residents, it was 87%.[12]

41.     A recent study found that the following characteristics increase a person's likelihood of obtaining a second-trimester abortion:  being Black; having less than a high-school degree; relying on financial assistance to pay for the procedure; living 25 or more miles from an abortion provider; and late recognition of pregnancy.[13]

### B.  *Public Health and Safety in Texas*

42.     Texas is the second largest state in the nation by both population and area.  Nearly 28 million people reside in Texas.[14]

43.     About 11% of Texas residents are not U.S. citizens.  Only two states have a higher percentage of non-citizen residents.

---

[11] Rachel K. Jones & Jenna Jerman, *Characteristics and Circumstances of U.S. Women Who Obtain Very Early and Second-Trimester Abortions*, 12 PLoS ONE 1, 5 (2017), http://journals.plos.org/plosone/article/file?id=10.1371/journal.pone.0169969&type=printable.

[12] *Table 33 Selected Characteristics of Induced Terminations of Pregnancy Texas Residents, 2014*, Texas Department of State Health Services, https://www.dshs.texas.gov/chs/vstat/vs14/t33.aspx (Oct. 9, 2017).

[13] Jones & Jerman, *Characteristics and Circumstances of U.S. Women* at 9-11.

[14] Unless otherwise noted, the data in this section are derived from *State Health Facts,* Henry J. Kaiser Family Foundation, https://www.kff.org/statedata/ (last visited June 14, 2018).

44.     Throughout Texas, arrests by Immigration and Customs Enforcement ("ICE") have increased, with increases in the northern part of the state up 76% in 2017.[15]  Similarly, transfers from local police departments to ICE have risen as much as 60% in some counties.[16]

45.     Overall, about 14% of Texas residents are living below the federal poverty level. Nearly 20% of Texas children are living below the federal poverty level.

46.     About 20% of Black Texas residents and 20% of Hispanic Texas residents live below the federal poverty level, compared with 8% of White Texas residents.

47.     Texas has the highest rate of uninsured people in the United States.  More than four million Texas residents—including 750,000 children—lack health insurance.  Nearly a quarter of women of reproductive age in Texas lack health insurance.[17]

48.     According to the Texas Medical Association, the uninsured are up to four times less likely to have a regular source of healthcare and are more likely to die from health-related problems.[18]

---

[15] Kristin Bialik, Pew Research Center, *ICE arrests went up in 2017, with biggest increases in Florida, northern Texas, Oklahoma,* http://www.pewresearch.org/fact-tank/2018/02/08/ice-arrests-went-up-in-2017-with-biggest-increases-in-florida-northern-texas-oklahoma/ (Feb. 8, 2018).

[16] Julian Aguilar, *Report: After Donald Trump took office, ICE transfers jumped 60 percent in most populous Texas county,* Texas Tribune, May 8, 2018, https://www.texastribune.org/2018/05/08/harris-county-ICE-arrests-increase-donald-trump/ (last visited June 14, 2018).

[17] Kinsey Hasstedt & Adam Sonfield, Guttmacher Institute, *At It Again:  Texas Continues to Undercut Access to Reproductive Healthcare,* https://www.guttmacher.org/article/2017/07/it-again-texas-continues-undercut-access-reproductive-health-care (July 18, 2017).

[18] *The Uninsured in Texas,* Texas Medical Association, https://www.texmed.org/uninsured_in_texas/ (last visited June 14, 2018).

49.     Texas had an unintended pregnancy rate of 56 per 1,000 women aged 15-44 in 2010, the last year for which data are currently available.  Only eight states had higher rates of unintended pregnancy.[19]

50.     In 2013, the teen pregnancy rate in Texas was 58 per 1,000 women aged 15-19.  Only two states had higher rates of teen pregnancy.[20]

51.     Texas has a high rate of maternal mortality.  Although it is difficult to ascertain the precise rate because of the State's poor recordkeeping, in 2012, there were at least 56 maternal deaths giving rise to a maternal mortality rate of at least 14.6 per 100,000 live births.[21]

52.     Black women are disproportionately affected by maternal mortality in Texas.  In 2012, the maternal mortality rate for Black women in Texas was at least 27.8 per 100,000 live births, nearly double the statewide average.[22]

53.     In 2014, 2,320 infants died in Texas before their first birthday.  Sixty-six percent of them were Black or Hispanic.[23]

---

[19] Kathryn Kost, Guttmacher Institute, *Unintended Pregnancy Rates at the State Level:  Estimates for 2010 and Trends Since 2002* 8 (2015), https://www.guttmacher.org/sites/default/files/pdfs/pubs/StateUP 2010.pdf.

[20] Kathryn Kost, Issac Maddow-Zimet & Alex Arpaia, Guttmacher Institute, *Pregnancies, Births and Abortions Among Adolescents and Young Women in the United States, 2013:  National and State Trends by Age, Race and Ethnicity* 35-36 (2017), https://www.guttmacher.org/sites/default/files/report_pdf/us-adolescent-pregnancy-trends-2013.pdf.

[21] Meagan Flynn, *Texas's Maternal Mortality Rate Was Unbelievably High.  Now We Know Why.*, Washington Post, April 11, 2018, https://www.washingtonpost.com/news/morning-mix/wp/2018/04/11/texas-maternal-mortality-rate-was-unbelievably-high-now-we-know-why/?utm_term=.be668 0814fd2.

[22] *Id.*

[23] *Table 29 Summary of Infant Deaths by Age, Race, Ethnicity and Sex, 2014*, Texas Department of State Health Services, http://www.dshs.texas.gov/chs/vstat/vs14/t29.aspx (August 3, 2016).

54.     In recent years, family violence has been on the rise in Texas. According to the Texas Department of Public Safety, in 2016, there were 196,564 incidents of family violence in Texas. That is a 10.4% increase from 2011.[24]

55.     Sexual assault has remained relatively constant in Texas in recent years. There were 18,349 incidents of sexual assault in Texas in 2016. That is a 1.4% increase from 2011.[25]

C.     *Decline in the Accessibility and Affordability of Reproductive Healthcare*

56.     The accessibility and affordability of reproductive healthcare services have been declining in Texas as a result of the laws challenged here and other governmental policies.

57.     In 2013, a law requiring physicians who perform abortions to have hospital admitting privileges caused more than half of the facilities providing first-trimester abortion care in Texas to stop providing that care. Prior to the enactment of the law, more than forty facilities provided first-trimester abortion care in Texas. After the law took effect, fewer than twenty facilities were able to provide such care. Many of the others were forced to close.

58.     Although the Supreme Court ultimately struck down the admitting-privileges requirement, *see Whole Woman's Health*, 136 S. Ct. at 2300, few of the clinics that had closed were able to reopen. Too much time had passed—staff members had been let go; buildings and equipment had been sold; doctors had moved on.

---

[24]     *Compare* Texas Department of Public Safety, *Crime in Texas 2016* 36 (2017), http://www.dps.texas.gov/crimereports/16/citCh5.pdf *with* Texas Department of Public Safety, *Crime in Texas 2011* 35 (2012), http://www.dps.texas.gov/crimereports/11/citCh5.pdf.

[25]     *Compare* Texas Department of Public Safety, *Crime in Texas 2016* 51 (2017), http://www.dps.texas.gov/crimereports/16/citCh7.pdf *with* Texas Department of Public Safety, *Crime in Texas 2011* 50 (2012), http://www.dps.texas.gov/crimereports/11/citCh7.pdf.

59.     The vast array of medically unnecessary legal requirements governing abortion care in Texas serves as a barrier to new providers entering the field.  As a result of these laws, few new clinics have opened to replace the ones that closed.

60.     WWHA's Austin clinic is a notable exception.  Last year, WWHA opened a new abortion clinic at a site where one had closed as a result of the admitting-privileges requirement.  Opening that clinic required the investment of a tremendous amount of time, effort, and resources by WWHA—a charitable organization with a mission to serve the needs of people seeking abortion care.

61.     For the average healthcare professional who is qualified and willing to provide abortion care, the demands of Texas law make opening an abortion clinic or otherwise providing abortion care prohibitively difficult.

62.     Medically unnecessary legal restrictions that limit the pool of abortion providers ultimately cause people who need abortion to suffer.  Healthcare professionals can provide other services, but someone who does not want to be pregnant has few options.  That person must find a way to reach a lawful provider, face the life-altering consequences of carrying a pregnancy to term, or take actions outside of the law to end the pregnancy.

63.     The availability of second-trimester abortion care is even more limited in Texas.  A 2003 law requires abortions to be performed in ambulatory surgical centers or hospitals beginning at 16 weeks' gestation (18 weeks lmp).  There are only a handful of such facilities willing to provide abortion care absent exceptional circumstances, and they are all located in the Texas's largest metropolitan areas:  Houston, Dallas-Fort Worth, Austin, and San Antonio.

64.     A 2013 law bans abortion beginning at 20 weeks' gestation (22 weeks lmp).  As a result, people delayed in reaching an abortion provider beyond that point may not lawfully end their pregnancies in Texas.

65.     At the same time that it has diminished the accessibility and affordability of abortion care, Texas has also taken steps to diminish the accessibility and affordability of contraception.

66.     In 2011, Texas slashed its family planning budget by two-thirds, resulting in sharply diminished access to contraception by low-income individuals.

67.     In 2013, Texas restored some of the funding, but excluded organizations that are affiliated with abortion providers from participating in its family planning program.  As a result, many of the State's most experienced family planning providers are unable to serve low-income communities, and many in those communities do not know where to go to access affordable contraception.

## II.     THE CHALLENGED LAWS

68.     Plaintiffs challenge Texas laws that fall into five categories:  targeted regulation of abortion providers ("TRAP"); laws that deny abortion patients the benefits of scientific progress; mandatory disclosure and waiting-period laws; parental involvement laws; and criminal penalties. Plaintiffs also challenge the General Appropriations Act's limitation on abortion funding as applied by the University of Texas System to prohibit students from completing internships and field placements with organizations that facilitate abortion access.

### A.     *Targeted Regulation of Abortion Providers (TRAP)*

69.     TRAP laws single out abortion providers for regulatory requirements that are different and more burdensome than those governing other healthcare providers.

70.     The requirements imposed by these laws are not based on differences between abortion and other medical procedures that are reasonably related to patient health.

71.     Texas enacted its first TRAP law in 1985.  It required abortion facilities to become licensed and meet minimum standards set by the then Texas Board of Health.  *See* 1985 Tex. Gen. Laws 3173-75.  The licensure requirement did not apply to physician's offices unless they were used "primarily" for abortion care.  *Id.* at 3174.  The original TRAP law also required abortion providers to report certain data about the abortion procedures they performed to the then Texas Department of Health on an annual basis.  *Id.* at 3173.

72.     Since 1985, Texas has amended this law numerous times, incrementally increasing the burdens on abortion access each time.

73.     For example, in 1999 and again in 2003, Texas narrowed the exemption for physician's offices.  *See* 2003 Tex. Gen. Laws 671, 1999 Tex. Gen. Laws 4820-21.  As a result of these amendments, any medical office that performs more than fifty abortions in a twelve-month period must be licensed as an abortion facility.

74.     In 2003, Texas added a requirement that, beginning at 16 weeks' gestation (18 weeks lmp), abortions must be performed in a hospital or ambulatory surgical center.  *See* 2003 Tex. Gen. Laws 2931.  In 2013, Texas added a requirement that all abortions be performed in a hospital or ambulatory surgical center, regardless of gestational age.  *See* 2013 Tex. Gen. Laws 5017.  That requirement was immediately declared unconstitutional.  *See Whole Woman's Health*, 136 S. Ct. at 2300.

75.     In 1997 and 2011, Texas amended the TRAP law's inspection provisions to make inspections more frequent and burdensome.  *See* 2011 Tex. Gen. Laws 346; 1997 Tex. Gen. Laws 4264.

76.     In 2012, 2013, and 2017, Texas amended the existing reporting requirements and added new reporting requirements, substantially expanding the scope of information that must be reported and increasing the frequency with which reports must be made.  *See* S.B. 8, 85th Leg., Reg. Sess. (Tex. 2017); H.B. 13, 85th Leg., 1st Called Sess. (Tex. 2017); 38 Tex. Reg. 9409, 9592 (Dec. 27, 2013); 37 Tex. Reg. 9831, 9938-41 (Dec. 21, 2012).

77.     In 2013, Texas added a requirement that all physicians who perform abortions have admitting privileges at a local hospital.  *See* 2013 Tex. Gen. Laws 5013-14.  That requirement has been declared unconstitutional.  *See Whole Woman's Health*, 136 S. Ct. at 2300.

78.     Plaintiffs challenge the following TRAP laws currently in force in Texas:

    a.  the <u>physician-only requirements</u> codified at Tex. Health & Safety Code §§ 171.003, 171.063(a)(1), 245.010(b); 25 Tex. Admin. Code §§ 139.2(1), 139.53(a)(7), which prohibit licensed, qualified clinicians who are not physicians from providing abortions;

    b.  the <u>facility licensure requirements</u> codified at Tex. Health & Safety Code §§ 245.003, 245.004, 245.006, 245.009, 245.010(a), 245.0105, 245.023(d); 25 Tex. Admin. Code, ch. 139, which require facilities at which abortions are performed to meet medically inappropriate licensure standards;

    c.  the <u>ASC requirement</u> codified at Tex. Health & Safety Code § 171.004, which requires abortions to be performed in an ambulatory surgical center or hospital beginning at 16 weeks' gestation (18 weeks lmp); and

    d.  the <u>reporting requirements</u> codified at Tex. Health & Safety Code §§ 171.006, 245.011, which require abortion providers to report detailed information to the State about their patients and practices.

79. These laws are enforced through civil and administrative fines, professional discipline, and criminal penalties. *See* Tex. Health & Safety Code §§ 171.005, 171.006(j)-(l), 171.064, 245.013-245.015, 245.017-245.022; Tex. Occ. Code §§ 164.055, 165.001-165.008, 165.101-165.103, 165.151; 25 Tex. Admin. Code § 139.33.

80. In the absence of the challenged TRAP laws, abortion providers would be subject to generally-applicable laws concerning scope of practice, 22 Tex. Admin. Code §§ 185.10, 221.12; office-based surgery, 22 Tex. Admin. Code §§ 192.1 – 192.6; recordkeeping, 22 Tex. Admin. Code §§ 165.1 – 165.5; medication dispensing, 22 Tex. Admin. Code §§ 169.1 – 169.8; complaints, 22 Tex. Admin. Code §§ 178.1 – 178.9; investigations, 22 Tex. Admin. Code §§ 179.1 – 179.8; and delegation, 22 Tex. Admin. Code §§ 193.1 – 193.20.

81. The challenged TRAP laws impose burdens on abortion access that are not justified by proportional benefits.

82. These burdens disproportionately impact poor people, people of color, immigrants, and others who are marginalized.

### B. *Laws That Deny Abortion Patients the Benefits of Scientific Progress*

83. The practice of medicine evolves over time as research and technological advancements enable clinicians to deliver care that is safer, more effective, less costly, and higher quality.

84. Texas has enacted laws that prevent abortion patients from enjoying the benefits of scientific progress.

85. Since abortion was legalized in 1973, the biggest advancement in the field of abortion medicine has been the development of mifepristone, a medication that enables safe and effective abortion beginning very early in pregnancy.

86.     Mifepristone blocks the hormone progesterone, which is necessary to maintain a pregnancy.  In medication abortion regimes, it is used in tandem with misoprostol, a medication that causes the uterus to contract and expel its contents.  Mifepristone is taken first, and misoprostol is typically taken six to 48 hours later.

87.     Medication abortion can be used very early in pregnancy, as soon as a pregnancy is confirmed.  Many abortion providers will not provide an aspiration abortion until the pregnancy can be visualized, typically at 5-6 weeks lmp.

88.     Mifepristone was approved for use in the United States in 2000.  Between 2004 and 2013, the percentage of total abortions by the medication method more than doubled nationwide, from 10.6 percent to 22.3 percent.  The percentage of medication abortions is expected to continue rising, unless legal restrictions interfere with the trend.

89.     The percentage of very early abortions—those performed prior to 6 weeks lmp—increased by 16% from 2004 to 2013.  The percentage of abortions performed very early in pregnancy is expected to increase further as the use of medication abortion becomes more common.

90.     Recognizing the potential of medication abortion to improve access to abortion care, abortion opponents have sought to halt its scientific development and restrict its availability.

91.     Plaintiffs challenge the following Texas laws that impose restrictions on the use of medication abortion:

> a.  the dosage and administration restrictions codified at Tex. Health & Safety Code § 171.063(a)-(b); 25 Tex. Admin. Code § 139.53(b)(3), which prevent abortion providers from incorporating scientific advancements into the provision of medication abortion;

b. the <u>physician examination requirement</u>, codified at Tex. Health & Safety Code § 171.063(c); 25 Tex. Admin Code § 139.53(b)(5), which requires a redundant and medically unnecessary physical examination by the physician who provides the medication abortion;

c. the <u>manufacturer's label distribution requirement</u> codified at Tex. Health & Safety Code § 171.063(d)(1), which requires abortion providers to distribute the manufacturer's label for mifepristone to abortion patients even though it may contain information that is redundant, inconsistent with, and/or confusing in light of the patient's written discharge instructions; and

d. the <u>follow-up visit requirement</u> codified at Tex. Health & Safety Code § 171.063(c)-(f); 25 Tex. Admin. Code § 139.53(b)(4), which imposes medically unnecessary restrictions on a patient's options for obtaining follow-up care after a medication abortion.

92. These laws are enforced through civil and administrative fines, professional discipline, and criminal penalties. *See* Tex. Health & Safety Code § 171.064; Tex. Occ. Code §§ 164.055, 165.001-165.008, 165.101-165.103, 165.151; 25 Tex. Admin. Code § 139.33.

93. The challenged restrictions on medication abortion impose burdens on abortion access that are not justified by proportional benefits.

94. These burdens disproportionately impact poor people, people of color, immigrants, and others who are marginalized.

95. Texas has also prohibited the use of telemedicine and telehealth in the provision of abortion care.

96.     Texas law defines "telemedicine medical service" as "a health care service delivered by a physician licensed in this state, or a health professional acting under the delegation and supervision of a physician licensed in this state, and acting within the scope of the physician's or health professional's license to a patient at a different physical location than the physician or health professional using telecommunications or information technology."  Tex. Occ. Code § 111.001(4).

97.     Texas law defines "telehealth service" as "a health service, other than a telemedicine medical service, delivered by a health professional licensed, certified, or otherwise entitled to practice in this state and acting within the scope of the health professional's license, certification, or entitlement to a patient at a different physical location than the health professional using telecommunications or information technology."  Tex. Occ. Code § 111.001(3).

98.     The use of telemedicine and telehealth is rapidly increasing in Texas and throughout the United States.

99.     Telemedicine and telehealth improve healthcare access and decrease healthcare costs.

100.    Texas recently amended its laws to facilitate the use of telemedicine and telehealth services in the State.  *See* S.B. 1107, 85th Leg., Reg. Sess. (Tex. 2017).

101.    Rather than apply the same reasonable regulations concerning telemedicine and telehealth services to abortion providers that it applies to all other healthcare providers, Texas has prohibited abortion providers from utilizing telemedicine and telehealth.  Tex. Occ. Code § 111.005(c).

102.     Medication abortion can be provided safely and effectively using telemedicine and/or telehealth.[26]

103.     Other abortion-related services, including pre-abortion counseling, can be provided safely and effectively using telemedicine and/or telehealth.

104.     In states where the use of telemedicine and telehealth in abortion care is lawful, patients report a high degree of satisfaction with abortion services provided via telemedicine or telehealth.[27]

105.     Plaintiffs challenge the following Texas law that imposes an explicit restriction on the use of telemedicine and telehealth in abortion care:

    a.     the telemedicine and telehealth ban codified at Tex. Occ. Code § 111.005(c), which prevents a health care provider who performs abortions from using telemedicine or telehealth services even when all of the regulatory requirements for using such services are satisfied.

106.     The challenged restriction is enforced through professional discipline.  *See* 22 Tex. Admin. Code § 174.7.

107.     Plaintiffs also challenge Texas laws that impose *de facto* restrictions on the use of telemedicine and telehealth in abortion care, including:  the physician examination requirement codified at Tex. Health & Safety Code § 171.063(c); 25 Tex. Admin. Code § 139.53(b)(5); the ultrasound requirement codified at Tex. Health & Safety Code § 171.012(a)(4)-(7); Tex. Occ. Code

---

[26] *See* Daniel Grossman & Kate Grindlay, *Safety of Medical Abortion Provided through Telemedicine Compared with in Person*, 130 Obstetrics & Gynecology 778, 778 (2017); Daniel Grossman, Kate Grindlay, Todd Buchacker, Kathleen Lane & Kelly Blanchard, *Effectiveness and Acceptability of Medical Abortion Provided through Telemedicine*, 118 Obstetrics & Gynecology 296, 296 (2011).

[27] *See* Kate Grindlay, Kathleen Lane & Daniel Grossman, *Women's and Providers' Experiences with Medical Abortion Provided through Telemedicine:  A Qualitative Study*, 23 Women's Health Issues e117, e117 (2013); Grossman *et al.*, *Effectiveness and Acceptability* at 296.

§ 164.0551; 25 Tex. Admin. Code §§ 139.50, 139.51(3)-(4), 139.52, 139.53(a)(3), 139.53(b)(6)(c); and the <u>procedural requirement that prohibits use of audio and video recordings</u> codified at Tex. Health & Safety Code § 171.012(b); Tex. Occ. Code § 164.0551.

108.    In the absence of the challenged restrictions, abortion providers would be subject to generally-applicable regulations concerning the use of telemedicine and telehealth services. Tex. Occ. Code §§ 111.001 – 111.007; 22 Tex. Admin. Code §§ 174.1 – 174.9.

109.    The challenged restrictions on the use of telemedicine and telehealth in abortion care impose burdens on abortion access that are not justified by proportional benefits.

110.    These burdens disproportionately impact poor people, people of color, immigrants, and others who are marginalized.

### C.    *Mandatory Disclosure and Waiting-Period Laws*

111.    In *Casey*, the Supreme Court held that states may take measures to ensure that a woman's decision to end a pregnancy is informed "as long as their purpose is to persuade the woman to choose childbirth over abortion" and they do not impose "an undue burden on the right." 505 U.S. at 878.

112.    Texas has enacted a series of mandatory disclosure and waiting-period laws that far exceed the authorization granted in *Casey*. As with its TRAP laws, Texas has made these laws incrementally more burdensome over time.

113.    Texas first enacted mandatory disclosure and waiting-period requirements for abortion in 2003. The 2003 law required abortion providers to provide certain information to patients seeking abortion care "orally by telephone or in person" at least 24 hours before the start of an abortion. 2003 Tex. Gen. Laws 2931-32. It also required abortion providers to offer their patients certain informational materials published by the State. *Id.* at 2931-33.

114. Texas amended this law in 2011, enacting numerous additional procedural requirements, including that certain information must be provided by the same physician who will perform the abortion; that the information must be provided in person unless the patient lives 100 miles or more from the nearest abortion provider; and that the information may not be provided by audio or video recording. 2011 Tex. Gen. Laws 343-46.

115. In 2011, Texas also added a requirement that abortion patients undergo an ultrasound examination narrated by the physician who will perform the abortion. *Id.* The narration must include specific information about the physical characteristics of the embryo or fetus. *Id.* The physician or a certified sonographer must display the ultrasound image in the patient's line of sight, regardless of whether the patient wants to view it, and make any embryonic or fetal heart tones audible regardless of whether the patient wants to hear them. *Id.*

116. Plaintiffs challenge the following mandatory disclosure and waiting-period laws currently in force in Texas:

a. the state-mandated information requirements codified at Tex. Health & Safety Code § 171.012(a)(1)-(3); Tex. Occ. Code § 164.0551; 25 Tex. Admin. Code §§ 139.50, 139.51(3)-(4), 139.52, 139.53(a)(3), 139.53(b)(6)(c), which—as applied by Defendants Young and Hellerstedt—require abortion providers to give irrelevant, medically inaccurate, and ideologically charged information to their patients;

b. the state-printed materials requirement codified at Tex. Health & Safety Code § 171.013; Tex. Occ. Code § 164.0551; 25 Tex. Admin. Code §§ 139.50(3)-(6), 139.51(9), 139.52, 139.53(a)(3), (b)(6)(c), which require abortion providers to distribute materials published by Defendants Young and Hellerstedt that contain irrelevant, medically inaccurate, and ideologically charged information;

24

c. the <u>ultrasound requirement</u> codified at Tex. Health & Safety Code § 171.012(a)(4)-(7); Tex. Occ. Code § 164.0551; 25 Tex. Admin. Code §§ 139.50, 139.51(3)-(4), 139.52, 139.53(a)(3), 139.53(b)(6)(c), which requires abortion providers to perform an often redundant and medically unnecessary ultrasound examination and provide a real-time narration while patients are undressed and—in the majority of cases—being examined with a vaginal probe;

d. the <u>waiting-period requirements</u> codified at Tex. Health & Safety Code §§ 171.012(a)(4)-(5), (b), 171.013; Tex. Occ. Code § 164.0551; 25 Tex. Admin. Code §§ 139.50(b), which impose mandatory waiting periods on abortion patients; and

e. the <u>procedural requirements</u> codified at Tex. Health & Safety Code §§ 171.012(a)(1)-(7), (a-1), (b)-(c), 171.0121; Tex. Occ. Code § 164.0551; 25 Tex. Admin. Code §§ 139.50(a), (c); 139.51(3)-(4); 139.52; 139.53(a)(3), (b)(6)(c), which impose burdensome and medically unnecessary procedural mandates on abortion providers in connection with the foregoing requirements.

117. These laws are enforced through civil and administrative fines, professional discipline, and criminal penalties. *See* Tex. Health & Safety Code § 171.005, 171.018; Tex. Occ. Code §§ 164.055, 165.001-165.008, 165.101-165.103, 165.151; 25 Tex. Admin. Code § 139.33.

118. Independent of the mandatory disclosure and waiting-period laws, Texas imposes informed consent requirements on all healthcare providers. *See* Tex. Civil Practice & Remedies Code §§ 74.101 – 74.107; 25 Tex. Admin. Code §§ 601.1 – 601.9.

119. The Texas Legislature created the Texas Medical Disclosure Panel "to determine which risks and hazards related to medical care and surgical procedures must be disclosed by health care providers or physicians to their patients or persons authorized to consent for their

patients and to establish the general form and substance of such disclosure." Tex. Civil Practice & Remedies Code § 74.102(a).

120. The Texas Medical Disclosure Panel has determined the risks and hazards that must be disclosed in connection with aspiration abortion and D&E, *see* 25 Tex. Admin. Code § 601.2(g)(13), as well as medication abortion, *see* 25 Tex. Admin. Code § 601.2(g)(14).

121. Abortion providers would be required to comply with the Texas Medical Disclosure Panel's directives even if the challenged mandatory disclosure and waiting-period laws were struck down.

122. The Texas Medical Disclosure Panel has determined that the risks of aspiration abortion and D&E abortion that warrant disclosure are the same as the risks of diagnostic or therapeutic dilation and curettage of the uterus, except that the risks of the abortion procedures also include failure to remove all products of conception. *Compare* 25 Tex. Admin. Code § 601.2(g)(13) *with* 25 Tex. Admin. Code § 601.2(g)(12).

123. The Texas Medical Disclosure Panel has determined that the risks of medication abortion that warrant disclosure are hemorrhage with possible need for surgical intervention; failure to remove all products of conception; and sterility. *See* 25 Tex. Admin. Code § 601.2(g)(14).

124. The Texas Medical Disclosure Panel does not require healthcare providers to identify breast cancer as a risk of any abortion procedure.

125. The state-mandated information requirements require abortion providers to discuss the risk of breast cancer with abortion patients and require abortion patients to sign a form certifying that they have received information about the risk of breast cancer.

126. The state-printed materials discuss the risk of breast cancer following an abortion.

127.    The claim that having an abortion increases a person's risk of breast cancer is not supported by scientific evidence.  Leading medical associations including the American Cancer Society have debunked this false claim.[28]

128.    The state-printed materials contain other false, misleading, and medically inaccurate information—including other purported risks of abortion that have not been identified by the Texas Medical Disclosure Panel.

129.    The challenged mandatory disclosure and waiting-period laws do not constitute reasonable regulation of the practice of medicine.

130.    The challenged mandatory disclosure laws compel abortion providers to say things to their patients that they would not otherwise say.

131.    The challenged mandatory disclosure and waiting-period laws impose burdens on abortion access that are not justified by proportional benefits.

132.    These burdens disproportionately impact poor people, people of color, immigrants, and others who are marginalized.

### D. *Parental Involvement Laws*

133.    Texas' parental involvement laws require minors—*i.e.*, people younger than eighteen years old—to obtain approval from a parent or judge before having an abortion, even in cases where the minor's parents are estranged, deceased, negligent, or abusive.  They also require minors to satisfy burdensome procedural requirements.

134.    Most minors voluntarily involve a parent in decisions about pregnancy and abortion.

---

[28] *See Abortion and Breast Cancer Risk*, American Cancer Society, https://www.cancer.org/cancer/cancer-causes/medical-treatments/abortion-and-breast-cancer-risk.html (June 19, 2014).

135.    Some minors have good reasons for not involving a parent in decisions about pregnancy and abortion—including that their parents are not involved in their lives or they reasonably fear violence or abandonment by their parents.

136.    Texas law permits minors to consent to all pregnancy-related medical care except abortion. *See* Tex. Fam. Code § 32.003.

137.    For other kinds of medical care, Texas law permits nonparents, such as grandparents, adult siblings, and other relatives, to consent on behalf of a minor. *See* Tex. Fam. Code § 32.001.

138.    Like the other laws challenged by Plaintiffs, Texas' parental involvement laws have become incrementally more burdensome over time.

139.    In 1999, Texas enacted a parental notification requirement. 1999 Tex. Gen. Laws 2466-2471. It required abortion providers to give notice to the parent or guardian of a minor seeking abortion care at least 48 hours in advance of the procedure. *Id.* at 2466-67. It also created a mechanism, which has come to be known as "judicial bypass," through which a minor could obtain a court order exempting the minor from the parental notice requirement. *See id.* at 2468-70.

140.    In 2005, Texas added a parental consent requirement to the parental notice requirement. 2005 Tex. Gen. Laws 734-35. It prohibits a physician from providing an abortion to a minor without the written consent of the minor's parent or guardian or a judicial bypass order. *See id.* at 734.

141.    In 2015, Texas added an identification requirement. 2015 Tex. Gen. Laws 1698. It requires physicians to request "proof of identity and age" from every woman seeking abortion

care.  *Id.*  If a woman cannot provide proof of identity and age, the physician must delay the abortion procedure while she attempts to obtain it.  *Id.*

142.    In 2015, Texas also amended the procedural requirements for judicial bypass to make it more difficult for minors to obtain a judicial bypass order.  *See id.*  at 1699-1703; Tex. Sup. Ct. R. for Judicial Bypass at 1 (explanatory statement).  For example, prior to the amendments, minors could file a judicial bypass application in any county in Texas.  As a result of the amendments, minors may only file an application in their county of residence, except in rare circumstances.  Likewise, the amendments raised the standard of proof for a minor's application from a preponderance of the evidence to clear and convincing evidence.  Prior to the amendments, if a court failed to rule on a judicial bypass application within two business days after it was filed, the application would be deemed granted.  Now, if a court fails to rule within five business days, the application is deemed denied.  The amendments also prohibit a minor from appearing in court telephonically or by videoconference.

143.    In 2017, Texas added additional reporting requirements for abortion providers treating minor patients, on top of the already voluminous reporting requirements that abortion providers must satisfy for all patients.  H.B. 215, 85th Leg., 1st Called Sess. (Tex. 2017).

144.    The vast majority of minors who seek a judicial bypass in Texas are seventeen years old.

145.    Plaintiffs challenge the following parental involvement laws currently in force in Texas:

    a.    the parental notice and waiting-period requirement codified at Tex. Fam. Code §
          33.002, Tex. Occ. Code § 164.052(a)(20), which requires abortion providers to give

48 hours' notice to the parent or guardian of a minor patient before performing an abortion;

b. the <u>identification requirement</u> codified at Tex. Fam. Code § 33.002(j)-(l); Tex. Occ. Code § 164.052(a)(20), which requires abortion patients to provide proof of identity and age or delay their abortion procedure while trying to obtain proof of identity and age;

c. the <u>parental consent requirement</u> codified at Tex. Fam. Code §§ 33.0021, 33.013; Tex. Occ. Code § 164.052(a)(19), which requires abortion providers to obtain consent from the parent or guardian of a minor patient before performing an abortion;

d. the <u>procedural requirements for judicial bypass</u> codified at Tex. Fam. Code §§ 33.003 – 33.007; Tex. Sup. Ct. R. for Judicial Bypass 2.1, 2.2(g), 2.5(b)-(c), 2.5(g), 3.3(f), which govern the process by which pregnant minors may obtain a court order authorizing them to obtain an abortion without parental notice or consent, including:

   i. the <u>venue restriction</u>, codified at Tex. Fam. Code § 33.003(b); Tex. Sup. Ct. R. for Judicial Bypass 2.1(a), which requires that a pregnant minor's application be filed in the minor's county of residence except in rare instances;

   ii. the <u>in-person requirement</u> codified at Tex. Fam. Code § 33.003(g-1); Tex. Sup. Ct. R. for Judicial Bypass 1.5(d), which prohibits the pregnant minor from appearing in court by videoconference, telephone conference, or other remote electronic means;

iii. the <u>heightened burden-of-proof</u> codified at Tex. Fam. Code § 33.003(1), (i-3); Tex. Sup. Ct. R. for Judicial Bypass 2.5(b), which requires pregnant minors to satisfy a clear and convincing evidence standard to prevail on their application;

iv. the <u>compulsory psychological examination</u> codified at Tex. Fam. Code § 33.003(i-I)(4); Tex. Sup. Ct. R. for Judicial Bypass 2.5(c)(4), which authorizes the judge hearing the application to compel the pregnant minor to be evaluated by a mental health professional;

v. the <u>nonsuit prohibition</u> codified at Tex. Fam. Code § 33.003(o); Tex. Sup. Ct. R. for Judicial Bypass 2.1(c), which prohibits pregnant minors from withdrawing their application without permission of the court; and

vi. the <u>pocket veto provisions</u> codified at Tex. Sup. Ct. R. for Judicial Bypass 2.1(g), 2.5(g), 3.2(c), 3.3(f), which provide that a pregnant minor's application or appeal is deemed denied if the court fails to rule on it within the statutorily prescribed time-period;

e. the <u>reporting requirements for minor patients</u> codified at Tex. Health & Safety Code § 171.006, which require abortion providers to report detailed information to the State about their minor patients in addition the detailed information they must report about patients of any age.

146. These laws are enforced through civil and administrative penalties, professional discipline, and criminal penalties. *See* Tex. Fam. Code §§ 33.012, 33.014; Tex. Occ. Code §§ 164.051(a)(1), 164.055, 165.001-165.008, 165.101-165.103, 165.151; Tex. Health & Safety Code § 171.005; 25 Tex. Admin. Code § 139.33.

147. The challenged parental involvement laws impose burdens on abortion access that are not justified by proportional benefits.

148. These burdens disproportionately impact poor people, people of color, immigrants, and others who are marginalized.

### E. *Criminal Penalties*

149. Texas imposes generally-applicable criminal liability on physicians who engage in certain acts of professional misconduct. *See* Tex. Occ. Code § 165.151.

150. In addition to generally-applicable criminal liability, Texas targets abortion providers for additional criminal liability related to all aspects of providing abortion care.

151. Physicians are not subject to additional criminal liability in connection with the provision of any other type of medical care.

152. Subjecting abortion providers to special criminal liability deters healthcare providers from providing abortions.

153. Plaintiffs challenge the following provisions that subject abortion providers to special criminal penalties: Tex. Health & Safety Code §§ 171.018, 245.003(a); Tex. Occ. Code § 165.151 as applied to Tex. Occ. Code §§ 164.052(a)(19)-(20), 164.055, and 164.0551.

154. The challenged criminal penalties impose burdens on abortion access that are not justified by proportional benefits.

155. These burdens disproportionately impact poor people, people of color, immigrants, and others who are marginalized.

### F. *Limitation on Abortion Funding*

156. Section 6.25 of Article 9 of the General Appropriations Act prohibits the distribution of money appropriated by the Act to any individual or entity that "(1) Performs an

abortion procedure that is not reimbursable under the state's Medicaid program; (2) Is commonly owned, managed, or controlled by an entity that performs an abortion procedure that is not reimbursable under the state's Medicaid program; or (3) Is a franchise or affiliate of an entity that performs an abortion procedure that is not reimbursable under the state's Medicaid program."[29]

157.    The University has interpreted this limitation on abortion funding to prohibit it from granting credit to students who complete a field placement with the Lilith Fund or other organizations that facilitate abortion access.

158.    The Lilith Fund does not perform abortion procedures; it is not commonly owned, managed, or controlled by an entity that performs abortion procedures; and it is not a franchise or affiliate of an entity that performs abortion procedures.

159.    Granting credit to a student enrolled in a degree program for completing a field placement with a host organization does not constitute a distribution of money to the host organization.

160.    The University's degree-granting programs do not constitute government speech.

161.    But for the limitation on abortion funding contained in the General Appropriations Act, the University would grant credit to qualifying students who complete a field placement with the Lilith Fund or other Plaintiffs.

162.    The University's interpretation of the limitation on abortion funding penalizes the Lilith Fund and other Plaintiffs for their speech about abortion.

---

[29] Abortion procedures are covered by Texas' Medicaid program only when continuation of a pregnancy would be life-threatening or the pregnancy resulted from rape or incest.  *See* 1 Tex. Admin. Code § 354.1167.

163.     The University's interpretation of the limitation on abortion funding interferes with the ability of the Lilith Fund and other Plaintiffs to recruit and train prospective employees and associates.

## III.     BURDENS IMPOSED BY THE CHALLENGED LAWS

164.     Individually and collectively, the challenged laws burden abortion access in three ways:  they directly burden individuals seeking abortion care; they compound other forms of discrimination and oppression that individuals seeking abortion care must battle; and they threaten the long-term sustainability of the practice of abortion care.

### A.     *Direct Burdens on Individuals*

165.     The challenged laws impose a number of direct burdens on individuals seeking access to abortion care.

166.     The challenged laws decrease the availability of abortion care—unnecessarily limiting the number of abortion providers, the geographic distribution of abortion providers, and the practice settings in which abortion care is provided.  As a result, people have fewer options for where to obtain abortion care.

167.     The challenged laws delay access to abortion care.  As a result, individuals have to wait longer to obtain abortions.  Absent the challenged laws, more people would be able to obtain very early abortions, and fewer would need second-trimester abortions.

168.     The challenged laws prevent some people seeking a medication abortion from having a medication abortion.

169.     The challenged laws increase the cost of abortion care.  As a result, patients must pay more money to obtain an abortion procedure.  Texas law prohibits both public and private health insurance from covering abortion care in most circumstances.

170.    The challenged laws stigmatize abortion care and entrench norms concerning traditional gender roles.

171.    The challenged laws increase the distance that many individuals must travel to access abortion care.  This makes it harder to find an affordable mode of reliable transportation.

172.    The challenged laws force some people to travel out of state to obtain abortion care.

173.    The challenged laws increase the time that someone must spend at an abortion facility to obtain an abortion procedure.  As a result, individuals must be absent from work, school, and/or family responsibilities for longer periods of time.

174.    The challenged laws make it harder for individuals to keep their pregnancy status confidential.  This burdens the privacy of all people seeking abortion care and exposes some to the threat of violence and harassment.

175.    The challenged laws increase the health risks that people face from pregnancy and abortion.

176.    The challenged laws increase the stress and anxiety that people with unwanted pregnancies must manage.

177.    The challenged laws lead some people to use illicit means to end or attempt to end a pregnancy.

178.    The burdens imposed by the challenged laws exacerbate one another.  Decreased availability of abortion care, for example, leads to increased delay and expense.  Increased expense leads to further delay for people who have to save up or raise the money for an abortion procedure.  Delay makes it harder for individuals to keep their pregnancies confidential and leads to increased cost, stress, and health risks.  It also imposes emotional and spiritual burdens on those who find later abortion less acceptable than early abortion.

179.    For some people, these burdens are prohibitive.  Others find a way to overcome them.  But in all cases, they undermine the dignity of individuals who may become pregnant—and their status as equal members of society—by forcing them to endure unnecessary hardship as a condition of obtaining abortion care.

180.    The Constitution prohibits states from imposing any burden on people seeking abortion care that is not justified by a proportional benefit, regardless of whether the burden ultimately prevents them from ending their pregnancies.  *See Whole Woman's Health*, 136 S. Ct. at 2300, 2309-10.  States cannot heap burdens on those seeking abortion care for no valid reason— and the desire to punish or stigmatize people for their reproductive choices is not a valid reason under the Constitution.  *See Casey*, 505 U.S. at 851-52, 877.

### B.    *Compounding Discrimination and Oppression*

181.    The challenged laws burden all people seeking abortion care.

182.    These burdens disproportionately impact poor people, people of color, immigrants, and others who are marginalized because they compound the effects of other forms of discrimination and oppression, such as racism and poverty.

183.    People living in poverty have a harder time accessing healthcare, including abortion care, than people with greater financial means.  The challenged laws compound this hardship, making it exponentially more difficult for poor people to access abortion care and increasing inequities both in the distribution of healthcare and in the ability to exercise constitutional rights.

184.    People of color are more likely to be poor than white people.  Controlling for income, people of color are more likely to experience bad health outcomes than white people because of the effects of structural racism in our society.  In Texas, for example, Black women are

twice as likely as others to die from pregnancy. The challenged laws compound the effects of structural racism.

185.     Immigrants often must contend with barriers to healthcare access that people born and raised in the United States do not. These barriers include lack of English proficiency; limitations on movement within a state; and fear of detention by immigration authorities. Indeed, the recent rise in immigration enforcement by federal and local agencies has led some immigrant families to defer or altogether forgo healthcare, including reproductive care.[30] The challenged laws compound these barriers.

186.     To accurately assess the burdens that the challenged laws impose on people seeking abortion care, we must examine those burdens in the context of people's actual life experience.

187.     The inequity that arises from denying some groups of people the practical ability to exercise fundamental constitutional rights is a burden that requires justification.

### C.     *Threatening the Sustainability of Abortion Care*

188.     In addition to imposing immediate burdens on abortion access, the challenged laws also threaten the long-term sustainability of the practice of abortion care.

189.     As improved access to contraceptives causes the abortion rate to decline, it becomes less economically feasible to provide abortion care in discrete, specialized clinics.

190.     This problem is most acute in rural areas that lack a large patient base, but it is a threat even to clinics in large, metropolitan areas.

---

[30] Ileanna Najaro & Jenny Deam, *Fearing deportation, undocumented immigrants in Houston are avoiding hospitals and clinics*, Houston Chronicle, Dec. 27, 2017, https://www.houstonchronicle.com/news/houston-texas/houston/article/Fearing-deportation-undocumented-immigrants-are-12450772.php (last visited June 14, 2018).

191. Abortion providers need to adapt their practice models to ensure that abortion care will remain accessible to everyone who seeks it.

192. The challenged laws do not afford abortion providers the flexibility they need to evolve in the face of changing circumstances.

193. The challenged laws make it practically impossible to integrate abortion care into more diversified medical settings—including primary care practices.

194. The challenged laws prevent abortion providers from using telemedicine and telehealth to serve patients.

195. If the long-term burdens imposed by these restrictions are not addressed until most or all of the clinics in Texas close, there will be a shortage of abortion providers that prevents some people from accessing abortion care.

196. If abortion providers were not subject to the unique, onerous, and medically unnecessary requirements, restrictions, and penalties embodied in the challenged laws, then more healthcare providers would be willing and able to provide abortion care, and they could do so in a wider variety of practice settings with more diverse revenue streams. As a result, the number and geographic distribution of abortion providers in Texas would increase, and their medical practices would be economically sustainable.

## CLAIMS

### COUNT I
### (Substantive Due Process)

197. The allegations of paragraphs 1 through 196 are incorporated as though fully set forth herein.

198.    The challenged laws—individually and collectively—impose an undue burden on access to previability abortion in Texas in violation of the Due Process Clause of the Fourteenth Amendment.

## COUNT II
### (Equal Protection)

199.    The allegations of paragraphs 1 through 196 are incorporated as though fully set forth herein.

200.    Each of the challenged laws denies equal protection of the laws to individuals seeking and providing abortion care in violation of the Equal Protection Clause of the Fourteenth Amendment.

## COUNT III
### (First Amendment—Free Speech)

201.    The allegations of paragraphs 1 through 196 are incorporated as though fully set forth herein.

202.    The state-mandated information requirements, state-printed materials requirement, and ultrasound requirement violate the freedom of speech of Plaintiffs WWHA and Dr. Kumar.

## COUNT IV
### (Vagueness)

203.    The allegations of paragraphs 1 through 196 are incorporated as though fully set forth herein.

204.    As applied by the University, the Limitation on Abortion Funding in the General Appropriations Act is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment.

## COUNT V
### (First Amendment—Unconstitutional Conditions)

205. The allegations of paragraphs 1 through 196 are incorporated as though fully set forth herein.

206. As applied by the University, the Limitation on Abortion Funding in the General Appropriations Act imposes unconstitutional conditions on Plaintiffs' freedom of speech and freedom of association, in violation of the First Amendment.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

A. Permanently enjoin Defendants and their employees, agents, and successors in office from enforcing:

    a. the challenged TRAP laws; and/or

    b. any challenged TRAP law or portion of a challenged TRAP law that is unconstitutional; and/or

    c. the challenged laws denying abortion patients the benefits of scientific progress; and/or

    d. any challenged law denying abortion patients the benefits of scientific progress or portion of a law denying abortion patients the benefits of scientific progress that is unconstitutional; and/or

    e. the telemedicine and telehealth ban as applied to the provision of medication abortion; and/or

    f. the telemedicine and telehealth ban as applied to the provision of state-mandated information; and/or

    g. the challenged mandatory disclosure and waiting-period laws; and/or

h. any challenged mandatory disclosure or waiting-period law or portion of a challenged mandatory disclosure or waiting-period law that is unconstitutional; and/or

i. the challenged parental involvement laws; and/or

j. any challenged parental involvement law or portion of a challenged parental involvement law that is unconstitutional; and/or

k. the challenged parental involvement laws as applied to seventeen-year olds; and/or

l. the challenged parental involvement laws to the extent that they do not permit grandparents, other adult relatives, and *de facto* guardians to give the required consent and receive the required notice; and/or

m. the challenged criminal penalties; and/or

n. any challenged criminal penalty or portion of a challenged criminal penalty that is unconstitutional; and/or

B. Permanently enjoin Defendant Faulkner and his employees, agents, and successors in office from applying the Limitation on Abortion Funding in the General Appropriations Act to deny students credit for completing field placements with Plaintiffs; and/or

C. Issue a declaratory judgment that the following provisions are unconstitutional:

a. the challenged TRAP laws; and/or

b. any challenged TRAP law or portion of a challenged TRAP law that is unconstitutional; and/or

c. the challenged laws denying abortion patients the benefits of scientific progress; and/or

d. any challenged law denying abortion patients the benefits of scientific progress or portion of a law denying abortion patients the benefits of scientific progress that is unconstitutional; and/or

e. the telemedicine and telehealth ban as applied to the provision of medication abortion; and/or

f. the telemedicine and telehealth ban as applied to the provision of state-mandated information; and/or

g. the challenged mandatory disclosure and waiting-period laws; and/or

h. any challenged mandatory disclosure or waiting-period law or portion of a challenged mandatory disclosure or waiting-period law that is unconstitutional; and/or

i. the challenged parental involvement laws; and/or

j. any challenged parental involvement law or portion of a challenged parental involvement law that is unconstitutional; and/or

k. the challenged parental involvement laws as applied to seventeen-year olds; and/or

l. the challenged parental involvement laws to the extent that they do not permit grandparents, other adult relatives, and *de facto* guardians to give the required consent and receive the required notice; and/or

m. the challenged criminal penalties; and/or

n. any challenged criminal penalty or portion of a challenged criminal penalty that is unconstitutional; and/or

D.     Issue a declaratory judgment that the Limitation on Abortion Funding in the General Appropriations Act is unconstitutional as applied by the University; and/or

E.     Grant Plaintiffs attorney's fees and costs pursuant to 42 U.S.C. § 1988; and/or

F.     Grant such other and further relief as the Court may deem just, proper, and equitable.

Dated: June 14, 2018

Respectfully submitted,

/S/ *Stephanie Toti*
_____

Stephanie Toti
646-490-1083
stoti@lawyeringproject.org
Amanda Allen*
646-490-1254
aallen@lawyeringproject.org
David Brown*
646-490-1225
dbrown@lawyeringproject.org
Juanluis Rodriguez*
646-490-1080
prodriguez@lawyeringproject.org
LAWYERING PROJECT
25 Broadway, Fl. 9
New York, NY 10004

Patrick J. O'Connell
LAW OFFICES OF PATRICK J. O'CONNELL, PLLC
2525 Wallingwood Dr., Bldg. 14
Austin, TX 78746
512-852-5918
pat@pjofca.com

Dipti Singh*
LAWYERING PROJECT
811 W. 7th St., Fl. 12
Los Angeles, CA 90017
646-480-8973
dsingh@lawyeringproject.org

*Application for admission *pro hac vice* forthcoming

*Attorneys for Plaintiffs*